

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

NO. PD-0893-14
NO. PD-0894-14

**JOEY DARRELL FAUST, Appellant**

**v.**

**THE STATE OF TEXAS**

**RAMON MARROQUIN, Appellant**

**v.**

**THE STATE OF TEXAS**

ON STATE'S PETITIONS FOR DISCRETIONARY REVIEW
FROM THE SECOND COURT OF APPEALS
TARRANT COUNTY

RICHARDSON, J., delivered the opinion of the Court in which MEYERS, JOHNSON, KEASLER, HERVEY, and ALCALA, JJ., joined. JOHNSON, J., filed a concurring opinion. YEARY, J., filed a concurring opinion. KELLER, P.J., filed a dissenting opinion. NEWELL, J., filed a dissenting opinion.

# O P I N I O N

On October 6, 2012, appellants, Joey Darrell Faust and Ramon Marroquin, while

protesting at a gay pride parade, each disobeyed a police officer's order to not cross a

skirmish line, resulting in their arrest for the offense of Interference with Public Duties under

Texas Penal Code Section 38.15(a)(1).[1] After a consolidated bench trial, each appellant was convicted and sentenced to two days' confinement in the Tarrant County Jail and assessed a $286 fine. Appellants appealed their convictions, asserting that Section 38.15(a)(1) had been unconstitutionally applied to them in violation of their First Amendment rights.[2] The Second Court of Appeals agreed with appellants and reversed their convictions. For the reasons discussed herein, we hold that Section 38.15(a)(1) was not unconstitutionally applied to appellants. Therefore, we reverse the decision of the Second Court of Appeals, and we order that the trial court judgments be reinstated.

### BACKGROUND

Appellants, Faust and Marroquin, along with several other members of the Kingdom Baptist Church, were protesting at a gay pride parade in downtown Fort Worth. Members of the Kingdom Baptist Church had a history of being involved in physical altercations at previous gay pride parades. Having been informed of such history of violence, the Fort Worth Police Department assigned several teams of police officers from the Zero Tolerance Unit as tactical response to control the crowd, maintain peace, and handle any physical

---

[1] TEX. PENAL CODE § 38.15(a)(1) provides that "[a] person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with: (1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." It is uncontroverted that appellants heard and purposely disobeyed the police officers' order.

[2] The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble. . . ." U.S. CONST., amend. I. The First Amendment right to freedom of speech applies to the states by virtue of the Fourteenth Amendment. *See Ex parte Thompson*, 442 S.W.3d 325, 334 (Tex. Crim. App. 2014).

altercations that might occur. Sergeant Paul Genualdo headed one of the tactical response teams.

Sergeant Genualdo testified during the bench trial that he first came in contact with Faust before the parade started. He asked Faust and the Kingdom Baptist Church members to join with other protesters to "have them in one area so they could still do their demonstration but just co-locate them." Sergeant Genualdo testified that the purpose of controlling the groups was "[t]o prevent a breach of the peace." He said that they "were trying to make sure that there were no physical altercations that took place." When he first asked Faust if his group would move, Faust "declined," and Sergeant Genualdo said "okay." Sergeant Genualdo then moved along with his team to another location along the parade route where they "maintain[ed their] position throughout the duration of the parade as it went by." Sergeant Genualdo testified that, as the end of the parade was passing the officers, there were "some crowds of civilians" walking down Main Street behind the parade. At that time, Sergeant Rachel DeHoyos and Lieutenant Glen Verrett ordered Team One and Team Five to form a police skirmish line. The officers' intent was to block off the southbound direction on Main Street in order to temporarily prevent the Kingdom Baptist Church members from going further south. The police were trying to "maintain a space" between the church members and the "trail end" of people supporting the parade in order to avoid any confrontation that could escalate into violence between the two groups. Sergeant Genualdo

emphasized that the skirmish line "was not intended to be permanent."  He stated that it was "a delay and [the church members] were going to be allowed to proceed southbound once we determined there was a safe time distance between the two."

Appellant Faust encountered Sergeant Genualdo at the skirmish line.  Sergeant Genualdo testified that he "held out his arms and told [Faust] he couldn't proceed any further for the time being."[3]  Faust asked Sergeant Genualdo if he was being detained, and Sergeant Genualdo told Faust that he was not being detained, and that he was free to proceed in any direction other than southbound down Main Street "at that time."[4]  Sergeant Genualdo then testified that Faust "began to physically berate [him], told [him] that [he] was working for a lesbian, told [him] that [he] needed to put earrings and a bow in [his] hair," and referred to Sergeant Genualdo as "a fag."[5]  Faust told Sergeant Genualdo that "he was going to cross the line and [Sergeant Genualdo] had better not try to stop him or he was going to sue [him]."  Faust then crossed "two or three feet past the skirmish line into the street," at which time

---

[3] Appellants have placed great emphasis on the argument that the police officers did not communicate the temporary nature of the skirmish line to appellants, leaving them to interpret the skirmish line as a permanent suppression of their right to continue to communicate their views to the parade-goers.  However, Sergeant Genualdo's testimony that he told Faust that they were being delayed "for the time being" is indicative that the temporary nature of the skirmish line was indeed communicated to Faust.

[4] Again, Sergeant Genualdo communicated that the skirmish line would be temporary.

[5] Other than this brief mention during Sergeant Genualdo's testimony that he was being "physically berated," there was no evidence to suggest that Faust had any physical contact with Sergeant Genualdo.  Faust was not charged with assaulting a police officer.

Sergeant Genualdo placed Faust under arrest for Interference with Public Duties and charged him with violating Texas Penal Code Section 38.15(a)(1). Although neither appellant was charged with Disorderly Conduct, Officer Genualdo testified that he believed that language used by Faust violated the Disorderly Conduct statute and was indicative of the language that Faust had used throughout the day.[6] Officer Genualdo testified that he was not concerned about Faust expressing his religious views. Rather, Officer Genualdo's testimony reflected his belief that Faust would likely direct the same type of language toward the parade supporters that he had used toward Officer Genualdo, which, in Officer Genualdo's mind, was language that was prohibited under the Disorderly Conduct statute because it would have likely incited violence.

On cross examination, Faust's counsel established that other people were allowed to cross the skirmish line, but Faust was not. Sergeant Genualdo explained that this was "due to the previous history the department has experienced with [Faust]," and that "the likelihood for violence was increased if [Faust] went and met with the trail end of the parade." The officers wanted to "prevent that from occurring."

Sergeant DeHoyos testified that there were altercations between the Kingdom Baptist Church protestors and the parade supporters and participants after last year's gay pride

---

[6] TEX. PENAL CODE §42.01(a)(1) provides that "[a] person commits an offense if he intentionally or knowingly: (1) uses abusive, indecent, profane, or vulgar language in a public place, and the language by its very utterance tends to incite an immediate breach of the peace."

parade. In her police report, which was offered into evidence by appellants as Defense

Exhibit 1, Sergeant DeHoyos described the history of violence involving the Kingdom

Baptist Church members:

> I worked the event last year and was present and observed several breaches of the peace caused by these individuals. These protestors were a group from Kingdom Baptist Church in Venus, Tx. They had extreme anti-homosexual views and yelled and screamed disparaging remarks at the persons attending the Gay Pride Parade. Examples that I heard were: "I hope you and your children die in a fiery crash" and "you should just go ahead and kill yourself you faggot!" Some of the statements uttered last year did provoke violence and incited at least one physical fight. Two other arrests were made when they used offensive language.[7]
>
> I also had previous knowledge that these persons from Kingdom Baptist church often come to downtown Fort Worth on Friday and Saturday nights and "street preach." They are well known and documented to use foul, abusive and offensive language which by its very utterance tends to incite an immediate breach of the peace. In some cases, the foul, abusive and offensive language is directed toward individuals whom they believe are homosexuals. As a result of these actions, one of their members was arrested for Assault Bodily Injury/Hate Crime Enhancement.

In her police report, Sergeant DeHoyos also described how appellants were interfering

with the police officers' exercise of their duties during this year's gay pride parade:

> . . . During the parade, the Kingdom Baptist Church group stayed in the 100-300 blocks of Main St. We received numerous complaints from persons attending the parade about the hateful speeches being uttered by this group but

---

[7] Sergeant DeHoyos testified at trial that she, too, believed the words used by the Kingdom Baptist Church members in protest at the prior year's gay pride parade were words that were likely to incite the immediate breach of the peace in violation of the disorderly conduct laws.

at this time they were complying with the law and were not violating any city ordinances.

When the parade ended, the majority of the persons attending the parade began to walk South on Main St. towards the area where the festival was being held. From my experience last year, I knew that this was when the majority of the volatile conflicts occurred between the Kingdom Baptist Church group and the persons who were attending the parade.

In order to keep a breach of the peace from occurring and to ensure the safety of both the parade attendees and the Kingdom Baptist Church group, I ordered Zero Tolerance Officers to form a skirmish line at 300 Main and keep the Kingdom Baptist Church group away from the parade attendees.

. . . I initially had four officers on the east side of the street and had to call for additional ZT Officers as the Kingdom Baptist Church group was attempting to push through our skirmish line. ARR1/Marroquin and another unidentified black male stepped off the curb line and were physically attempting to push through the line. I had to push them back and told them to get back on the curb. Marroquin continually attempted to break through the line, and I had to push him back at least four times. Officer Medders, Officer Gray and Officer Johnson also had to push him back. Marroquin kept asking if he was being detained and I told him he was not detained, but he could not walk past me. I told him he could walk back the other direction. I told him if he went past me I could not guarantee his safety, he told me "I didn't ask you to watch for my safety" and attempted to walk past me and I pushed him back again. Marroquin again attempted to push past myself and Officer Gray by forcing his shoulder between the two of us. This action was interfering and disrupting me from exercising and performing my duty to keep a breach of the peace from occurring as imposed by law. I then arrested ARR1/Marroquin for Interference with Public Duties of a Peace Officer.

Shortly after this occurred, Sergeant Genualdo encountered ARR2/Foust [*sic*] on the West side of the street. Sergeant Genualdo told me that Foust [*sic*] tried to cross the street southbound. Sergeant Genualdo told him he could not go any further. . . . Sergeant Genualdo told him that he couldn't guarantee his safety if he did. Foust [*sic*] said, "I didn't ask you to do that." . . . Genualdo

told him he could not cross and had to extend his arm to keep Foust [*sic*] from passing.  Foust [*sic*] then said "I'm only going to let you detain me for a few more minutes and then you arrest me if you want to."   Foust [*sic*] then attempted to walk past Sergeant Genualdo.  This action was interfering and disrupting Sergeant Genualdo from exercising and performing his duty to keep a breach of the peace from occurring as imposed by law.

Sergeant DeHoyos testified that it was not their intention "to prevent anyone from expressing Christian views or any type of religious views."  They were simply "attempting to prevent a breach of the peace, mainly being disorderly conduct, or in a worst-case scenario, riot."  The skirmish line was implemented, based on past and current conduct of the members of the Kingdom Baptist Church, because the officers were concerned for the safety of both the protestors and the parade supporters and participants.[8]  Sergeant DeHoyos stated that, because of the problems appellants and other members of the Kingdom Baptist Church caused the year before, at that same location, the police were trying to prevent commingling of the people attending the parade and the Kingdom Baptist Church protestors so that they could avoid any physical altercations.  She explained,

> I wasn't so concerned about once they got to the 900 block, because last year we were able to contain them fairly well and just had to endure the constant aberration [*sic*].  But it's that—that gap from where we held them initially to the 900, so basically those six blocks, my concern was in those six blocks, what would happen there because that's where the problems occurred the previous year.  That's where, as they were commingling, you had people attending the festival and the parade and you had people from the Kingdom

---

[8] Sergeant DeHoyos testified that the police were concerned about protecting "not only the parade-goers, but the protestors themselves," because there was the "possibility of violence being used against them also."

Baptist Church, as they were both moving down, that's where the altercation occurred and that's what we were trying to prevent.

Sergeant DeHoyos testified at trial that Marroquin tried to cross the row of police officers by attempting to push through the skirmish line. When Marroquin tried to push his way across the skirmish line, he, too, was arrested for Interference With Public Duties in violation of Section 38.15(a)(1).

At the close of the State's evidence the State rested, and then the defense rested. At that time appellants' defense counsel presented to the trial court a Motion for Judgment, along with a Memorandum Brief in support of such motion. In their brief, appellants acknowledged that "[a]n 'applied' challenge to a law can only be brought 'during or after a trial on the merits.'"[9] Appellants urged the following arguments before the trial court: (1) prior events are not a basis for "prior restraint" of speech;[10] (2) apprehension of disturbance is not enough to overcome the right to freedom of expression;[11] (3) where "prior similar

---

[9] Defendant's Memorandum Brief at 2 (citing to *State of Texas v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011)).

[10] *Id.* at 6 (citing to *Carroll v. President of Princess Anne,* 393 U.S. 175, 180, 182, 185 (1968)). *Carroll* involved a lawsuit brought by the county and the town to restrain members of a political party from holding rallies. The Supreme Court set aside the ten-day order imposing the restraint, but not because the Court addressed "the thorny problem of whether, on the facts of this case, an injunction against the announced rally could be justified." The Court acknowledged that prior restraints on protected speech bears "a heavy presumption against its constitutional validity." However, the Court also noted that this presumption can be overcome with the proper "procedural safeguards designed to obviate the dangers of a censorship system."

[11] *Id.* at 7 (citing to *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508 (1969)). *Tinker* involved a lawsuit seeking an injunction against enforcement by school

activity led to or involved instances of violence," the "law is clear that First Amendment activity may not be barred;"[12] (4) Government is "to punish it [wrong conduct] after it occurs rather than to prevent the First Amendment Activity;"[13] and (5) the proper way for government to deal with "potential and actual violence is for government to ensure an adequate police presence . . . and to arrest those who actually engage in such conduct, rather than suppress legitimate First Amendment conduct as a prophylactic measure."[14] Appellants' counsel argued orally that "arresting them for attempting to cross the street when other members of the public were permitted is absolutely unconstitutional." Appellants' counsel

---

officials of a regulation prohibiting the wearing of black armbands by students in protest of the Vietnam War. The Court noted that "apprehension of disturbance is not enough to overcome the right to freedom of expression." Under the facts of that case, we would agree. The "apprehension of disturbance" under the facts of *Tinker* is notably different from the police officers' concern for public safety based on the church members' history of violence that was present in this case.

[12] *Id.* (citing to *Collins v. Jordan,* 110 F.3d 1363, 1372 (9th Cir. 1996)). *Collins* involved a class action lawsuit brought against police officials by those arrested for demonstrating after the Rodney King verdict was announced. The plaintiffs' First Amendment claims were to the effect that the police had unlawfully banned all demonstrations and unlawfully arrested those who refused to disperse. The court held that the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations on the following day. Again, this case is distinguishable on the facts. *Collins* involved a complete ban on expressive activity. That was not what occurred here. Appellants were not banned from expressing their views. The prior history of violence was relevant information that caused the police to, rightfully, be on heightened alert. It was only near the end of the parade route—after appellants had been allowed to fully voice their views in protest throughout the duration of the gay pride parade—that the police decided to temporarily create a time and space separation between two groups in their effort to keep the peace. As we explain herein, such restriction fell within the noted exception allowing for such restraint. In fact, the court in *Collins* acknowledged that, under certain circumstances, a "time-limited ban" could be lawful, depending on whether the police had "reliable information that organized violence of a serious nature is about to occur."

[13] Id. (citing to *Collins*, 110 F.3d at 1371-72).

[14] *Id.* at 9 (citing to *Collins*, 110 F.3d at 1372).

concluded by arguing that, as to each appellant, "this was an unconstitutional arrest and the charges that have been brought are based on an unconstitutional application of this statute to these facts." In response, the State argued that "the officers were performing a lawful duty, trying to prevent a breach of the peace. These defendants both have a history of inciting a breach of the peace at this very parade in the past couple of years and the officers were trying to maintain order and peace."

The trial court denied appellants' Motion for Judgment and found both Faust and Marroquin guilty of the offense of interference with public duties. Before sentencing Appellants, the trial court judge explained his ruling as follows:

> I want to start by saying that I am not a person who will sit up here and defend a police state. I don't think that's what we had here. I like for the police to follow the rules that everyone else does. I have probably granted more motions to suppress in cases, maybe than any other judge in this courthouse, because of that. However, I think the police in this case, in your cases, were performing a legitimate function, and it is not my intention here to say that you and your group cannot express your views. You're certainly protected by law in that expression of views, whatever it is. I don't see this as a free-speech case, I see this as a maintaining public order case. We've got to have rules in our society or it's going to be chaos. And I'm not going to sit here and say, well, gosh, we should wait until there's a brawl in the street before the police take action, because we don't want that. You can't stand up in the middle of a crowded theatre and yell fire for that very reason. There's got to be order in our society or we don't have society anymore. So that's the approach I'm taking on y'all's cases.

## THE COURT OF APPEALS' DECISION

Appellants' sole issue raised on direct appeal was that "they were detained based on speculation of the content of their future speech in violation of their First Amendment rights," and thus Section 38.15(a)(1) was unconstitutionally applied to them.[15] The Second Court of Appeals agreed, finding that, "[b]y targeting the Kingdom Baptist Church members for restraint based solely on their history of violence induced by their abusive speech, the police officers necessarily implicated the group's First Amendment rights."[16] The appellate court held that the police skirmish line was an unconstitutional infringement upon appellants' right of free speech. The appellate court held that, "[t]he prohibition against crossing the skirmish line 'must be judged against the stringent standards we have established for restrictions on speech in traditional public fora.'"[17] The court further noted that "[b]ecause the skirmish line was directed at the possible secondary effects of the church group's speech, we look to whether the skirmish line was narrowly tailored to serve a significant government interest."[18] The appellate court held that the police skirmish line "was not narrowly tailored

---

[15] *Faust v. State*, Nos. 02-13-00222-CR, 02-13-00223-CR, 2014 WL 2611186, at *2 (Tex. App. —Fort Worth June 12, 2014) (mem. op., not designated for publication).

[16] *Id.*

[17] *Faust,* 2014 WL 2611186, at *2 (quoting *Frisby v. Schultz*, 487 U.S. 474, 481 (1988)).

[18] *Id.* at *3 (citing to *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983)).

to serve the government's interest in public safety."[19] The appellate court believed that precluding all members of the church from exercising their First Amendment rights based on their affiliation with the church was "far too broad a limitation."[20] Although agreeing that the police were not required to wait until violence erupted before stepping in, the court of appeals found that "there must have been some indication that the public's safety was at risk beyond the history of one assault by a member of the organization who may not even have been present at the time the skirmish line was in place."[21] The court of appeals reversed the appellants' convictions. It held that, by restricting appellants from crossing the police skirmish line due to their status as members of the Kingdom Baptist Church, while allowing other members of the public who were not members of the church to cross the line, the police officers acted in violation of appellants' First Amendment rights. Thus, said the court, arresting appellants for Interference with Public Duties when they disobeyed the police orders to not cross the skirmish line was an unconstitutional application of Section 38.15(a)(1).

## THE STATE'S PETITION AND THE ARGUMENTS OF THE PARTIES

We granted the State's petition for discretionary review to address whether the court of appeals erred in determining that the police officers' skirmish line had been ordered in

---

[19] *Id.* at *3 (noting that "[a]ll members of the church were barred from proceeding down the street regardless of whether they had previously assaulted parade-goers or not, whether they were yelling profanity or threatening words or not, or whether they were even protesting at all").

[20] *Id.* at *4 (citing to *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

[21] *Id.* at *4.

violation of appellants' First Amendment rights, and thus appellants' conviction for disobeying such an order was an unconstitutional application of Section 38.15(a)(1).[22]

Appellants seek to have this Court uphold the decision of the Second Court of Appeals, arguing that the conduct of the police in precluding appellants from crossing the skirmish line, while letting other members of the public cross said line, was an unconstitutional infringement upon appellants' rights of free speech and assembly. Appellants claim that because the skirmish line had no lawful purpose, the application of Section 38.15(a)(1) to crossing the skirmish line was unconstitutional.[23]

---

[22] The State's petition presents four grounds for review:

1. Did the Second Court of Appeals err in implicitly holding that citizens can use the First Amendment to the United States Constitution as a shield to disobey lawful orders of law enforcement and forcibly cross a police skirmish line set up at a gay pride parade in Fort Worth, Texas, when those measures by law enforcement are taken to preserve the peace and the safety of the public?

2. Notwithstanding that police action may infringe on a citizen's First Amendment rights, does a citizen have a right to disobey orders of a police officer, forcibly breach a skirmish line imposed, and interfere with the officer's duties?

3. Did the Second Court of Appeals err in failing to conduct a proper "as applied" First Amendment analysis when it concluded that the Fort Worth Police Department's action in constructing a skirmish line at a gay pride parade violated the First Amendment to the United States Constitution?

4. Did the Second Court of Appeals err in concluding that the skirmish line set up by the police department during the Fort Worth Gay Pride Parade was not a reasonable action as to "time, place or manner" under the First Amendment to the United States Constitution?

[23] "The issue in these cases is not and never has been the language of Section 38.15(a)(1). It has always been its application to crossing the skirmish line, which had no lawful purpose." Appellant's Brief on the Merits, at 12, *Faust v. State,* Nos. 02-13-00222-CR, 02-13-00223-CR, 2014 WL 2611186 (Tex. App.—Fort Worth June 12, 2014) (mem. op., not designated for publication).

The State asserts that appellants' restraint under Section 38.15(a)(1) was pursuant to a valid, content-neutral regulation, and that appellants were not arrested because of their expressive activity, but as a result of their disobedient behavior and failure to comply with the lawful orders of law enforcement officers.  The State argues that appellants had no right under the First Amendment to disobey the orders of law enforcement officers on the basis that the officers were acting in violation of appellants' constitutional rights.

## ANALYSIS

### *The Constitutionality of Section 38.15(a)(1) "As Applied" to Appellants Depends Upon the Constitutionality of the Police Skirmish Line*

An "as applied" challenge to the constitutionality of a statute asserts that a statute, although generally constitutional, operates unconstitutionally as to the claimant because of his particular circumstances.[24]  When reviewing the constitutionality of a statute, we presume that the statute is valid and that the Legislature acted reasonably in enacting it.[25]

A person commits the offense of Interference With Public Duties under Section 38.15(a)(1) ". . . if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with: (1) a peace officer while the peace officer *is performing a duty or exercising authority imposed or granted by law*."[26]  Appellants urge this Court to affirm the

---

[24] *See State ex rel. Lykos v. Fine,* 330 S.W.3d 904, 910 (Tex. Crim. App. 2011); *Gillenwaters v. State*, 205 S.W.3d 534, 536 n.3 (Tex. Crim. App. 2006).

[25] *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002).

[26] TEX. PENAL CODE § 38.15(a)(1) (emphasis added).

appellate court's decision that, since appellants were convicted under Section 38.15(a)(1) for interfering with a police skirmish line that violated their First Amendment rights and, as such, was not an order issued under authority "imposed or granted by law," Section 38.15(a)(1) was unconstitutionally applied to them.

We begin by examining more closely the language of Section 38.15(a)(1), as it applies to this case. Appellants were found guilty of interfering with the peace officers while they were "performing a duty or exercising authority imposed or granted by law." Peace officers have a duty, under Article 2.13 of the Texas Code of Criminal Procedure, "to preserve the peace within the officer's jurisdiction."[27]  The testimony by Sergeants Genualdo and DeHoyos shows that the officers were performing such duty when they set up the skirmish line with the purpose of temporarily separating two groups with drastically conflicting views, and that appellants interfered with that duty when they disobeyed the officers by intentionally crossing the skirmish line after being told not to.  In imposing a duty upon peace officers to "preserve the peace," Article 2.13 further cautions that, "to effect this purpose, the officer shall use all lawful means."  Appellants' constitutional challenge is to the lawfulness of the means used by the police in performing their duty to preserve the peace—the skirmish line.

---

[27] TEX. CODE CRIM. PROC. art. 2.13.

That was the claim raised by appellants before the trial court, that was the claim raised and addressed on direct appeal, and that is the claim we address today.[28]

Public streets and sidewalks are traditional public forums.[29] Picketing and marching, if peaceful and orderly, are entitled to First Amendment protection as methods of

---

[28] We do not perceive a preservation-of-error issue here. It has been clear from day one that appellants were raising a constitutional "as applied" challenge. Appellants argued before the trial court that they were challenging the constitutionality (i.e., the lawfulness) of the skirmish line, and they raised that claim on appeal. Had the trial court agreed with appellants and rendered a judgment of acquittal, perhaps the State could have raised a valid argument that its right to appeal should not be foreclosed by such a ruling; the trial court might have erred had it granted an acquittal, as opposed to a dismissal, since the basis for relief was a constitutional challenge. *See*, *e.g.*, *Cain v. State*, 855 S.W.2d 714, 715 n. 2 (Tex. Crim. App. 1993). *But see*, *Flores v. State*, 245 S.W.3d 432, 443 (Tex. Crim. App. 2008) (Cochran, J., concurring) ("There is only one remedy for either the trial or appellate court: dismiss the indictment and enter an acquittal because the defendant was convicted under an unconstitutional application of an otherwise valid penal statute."). However, since the trial court did not enter an acquittal, that scenario is not before us.

In *Freeman v. State*, 340 S.W.3d 717, 730 (Tex. Crim. App. 2011), the appellant raised an "as applied" constitutional challenge on appeal. This Court held that defendant's bare request for an acquittal, without articulating a reason, was not enough to preserve error of his constitutional claims. Appellant did not specify that his complaint was of the constitutionality of Texas Penal Code Section 19.03. *Id.* In this case, however, appellants' request for acquittal made at the close of all the evidence clearly and unambiguously articulated the basis for the relief sought from the trial court judge.

In *Resendez v. State*, 306 S.W.3d 308, 312-13 (Tex. Crim. App. 2009), this Court held that "no technical considerations or forms of words" are required to preserve an error for appeal, and a party must only "be specific enough so as to 'let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.'" *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). The trial court and the State understood the relief appellants were seeking and the basis for their claim for relief.

In this case, appellants did not specifically request an "instructed verdict." After the State closed, and after appellants rested, defense counsel brought a motion for judgment "finding that the arrest and prosecution under this law, as applied to these facts, they are not guilty." Therefore, we do not believe that there was a failure on appellants' part to preserve their right to appellate review of their constitutional "as applied" challenge.

[29] *See Hill v. Colorado*, 530 U.S. 703, 715 (2000).

expression.[30] There is no dispute that appellants had a First Amendment right to express their views in a public forum. And, they were allowed to do so. The First Amendment forbids the government from regulating speech in ways that favor some viewpoints or ideas at the expense of others.[31]

However, restrictions that have an effect on protected speech may nevertheless be allowed under certain circumstances. The Supreme Court has held that, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided [1] the restrictions 'are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information.'"[32] We hold that the purported restriction in question

---

[30] *Gregory v. Chicago*, 394 U.S. 111, 112 (1969) (holding that convictions for Disorderly Conduct could not be sustained where defendants had not been disorderly). Appellants place great emphasis on the precedential value of the *Gregory* case. However, the defendants in *Gregory* were arrested for Disorderly Conduct with regard to the manner in which they held their demonstration. The Supreme Court made it clear that "[defendants] were charged and convicted for holding a demonstration, not for a refusal to obey a police officer." We find this distinction significant since, in this case, appellants *were* charged and convicted for refusal to obey a police officer.

[31] *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984). The First Amendment prohibits laws that abridge freedom of speech. U.S. CONST., amend. I. The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. *See Virginia v. Black*, 538 U.S. 343, 358 (2003).

[32] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citing to *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Relying upon *Madsen v. Women's Health Center*, 512 U.S. 753 (1994), the dissenting opinion views the police skirmish line as more of an injunction than a general statute or ordinance, which would mean that a more stringent application of general First Amendment principles should be applied. In *Madsen*, a civil action, the Supreme Court focused on the relief sought by the plaintiff. The Court drew a distinction between injunctions and statutes because injunctions "can be tailored by a trial judge to afford more precise relief." 512 U.S. at 765.

here—the police skirmish line—was a reasonable restriction on the time, place, and manner of protected speech because the skirmish line met the above three requirements. Therefore, we hold that the temporary skirmish line was a lawful means to effect the police purpose of preserving the peace at the gay pride parade.[33]

Its "close attention to the fit between the objectives of an injunction and the restrictions it imposes on speech is consistent with the general rule, quite apart from First Amendment considerations, 'that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Id.* (internal citations omitted). Thus, said the Court, "our standard time, place, and manner analysis is not sufficiently rigorous." *Id.* In *Madsen*, using the stricter standard, the Court examined each contested provision of the court's injunction order to see if it burdened more speech than necessary to accomplish the valid governmental interests of protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy, ensuring public safety and order, promoting the free flow of traffic on public streets and sidewalks, and in protecting the property rights of all citizens. The Supreme Court upheld some of the restrictions in the injunction order and struck down others as too broad. *Id.* at 776. However, there is a distinction between analyzing First Amendment challenges to an injunction, which is a "judicial remed[y] for proven wrongdoing," *Id.* at 778 (dissenting opinion, J. Stevens), and analyzing a First Amendment challenge to a police skirmish line, which is a government imposed restriction pursuant to statutory authority. In any event, even under the stricter *Madsen* standard, the police skirmish line did not burden more speech than necessary to accomplish its goal. The goal was to assure a peaceful end to the parade festivities by creating a temporary time gap between the Kingdom Baptist Church protestors, who were known to have caused violent confrontations at prior gay pride parades, and the trail end of the parade-goers and participants. The church members had been permitted to express their religious views along the parade route as the parade passed by them, and they would have been permitted to continue expressing their views once the potential for violent confrontations had diminished. The "burden" to the church members was a delay in their ability to communicate their message in all directions (they were permitted to go in any other direction other than one). Even under the *Madsen* standard, we would not find that speech was burdened more than necessary for the police to accomplish their goal.

[33] We reviewed the appellate court's decision under the same assumption—that the officers were regulating protected speech. However, Sergeants Genualdo and DeHoyos both testified that they believed that appellants, while protesting at the gay pride parade, had used language that was not protected speech, but rather was language prohibited under the Disorderly Conduct statute. Although the officers did not arrest appellants for Disorderly Conduct, they expressed concern that, if appellants were allowed to proceed past the skirmish line and come in close contact with the parade-goers as they all gathered at the end of the parade, appellants were likely to use language that would tend to incite an immediate breach of the peace. Speech used in a "public place," that is "abusive, indecent, profane, or vulgar," and that, "by its very utterance tends to incite an immediate breach of the peace," is prohibited under the Disorderly Conduct statute, TEX. PENAL CODE §42.01(a)(1). The government may prohibit speech or conduct which has a tendency to incite or produce immediate violence. *See,*

1.      Content Neutral

In determining content neutrality, we look to whether the police order to not cross the skirmish line had the purpose of regulating appellants' speech "because of disagreement with the message it conveys."[34] The officers' purpose in setting up and enforcing the skirmish line is the controlling consideration.[35] A regulation that serves purposes unrelated to the content of the protected speech is deemed content neutral, "even if it has an incidental effect on some speakers or messages but not others."[36] In fact, regulations restricting speech are found to

---

e.g., *Chaplinsky v. New Hampshire*, 315 U.S. 568, 574 (1942) (holding that New Hampshire's statute prohibiting "fighting words" in public forums was constitutional because "[a] statute punishing verbal acts, carefully drawn so as to not unduly impair liberty of expression, is not too vague for a criminal law."); *Cantwell v. Connecticut*, 310 U.S. 296, 309-10 (1940) (holding that personal abuse and epithets were not "in any proper sense communication of information or opinion safeguarded by the Constitution and its punishment as a criminal act would raise no question under that instrument"). Although the specific language used by Faust, about which Sergeant Genualdo testified as the kind of speech tending to incite violence, came *after* he ordered Faust to not cross the skirmish line, Sergeant Genualdo also testified that such language was "indicative of [Faust's] behavior during the course of the day." The appellate court made the threshold decision that, because the officers would not allow the members of the Kingdom Baptist Church to go past the skirmish line, while allowing others who were not members of the Kingdom Baptist Church to proceed past the line, the officers implicated appellants' First Amendment rights. However, the motives of the police in setting up the skirmish line were not based on curtailing the church's message, but rather were directed toward maintaining public safety. Sergeant DeHoyos explained that if other parade-goers, not affiliated with the church, had been using "fighting words" or "had been carrying signs or using speech that could incite violence," then those people would also be prohibited from crossing the skirmish line. Therefore, to the extent that the skirmish line was issued to prevent confrontations that might arise from appellants' use of speech tending to incite an immediate breach of the peace, and thus not protected under the First Amendment, such regulation does not implicate appellants' First Amendment rights.

[34] *Id.; Hill v. Colorado*, 530 U.S. 703, 719 (2000) (quoting from *Ward*, 491 U.S. at 791).

[35] *Ward*, 491 U.S. at 791.

[36] *Id.* at 791.

be content neutral when they are directed to the secondary effects of a speaker's conduct as opposed to the content of the speech itself.[37]

While any governmental attempt to censor appellants' expressions of their beliefs would raise serious First Amendment concerns, it is clear that the officers intended to prevent direct and close confrontation between appellants and the parade-goers in order to promote safety, not to stifle appellants' expressions of their beliefs. The officers' testimony showed they had no interest in imposing their own views on appellants. Their testimony reflects concern for the preservation of order and protection of the public. The officers' concern for public safety extended only to the goal of ensuring that no violence would erupt between the Kingdom Baptist Church members and the parade supporters and participants. Therefore, we find that the skirmish line was content neutral, even though it may have had the incidental effect of temporarily hindering appellants' ability to deliver their message to the parade-goers.

The appellate court acknowledged that the police skirmish line was content neutral because of the officers' testimony that the skirmish line was set up due to concern for public safety. The court noted that, "[b]ecause the skirmish line was directed at the possible secondary effects of the church group's speech, we look to whether the skirmish line was narrowly tailored to serve a significant governmental interest."[38] We agree with this

---

[37] *City of Renton v. Playtime Theatres*, 475 U.S. 41, 47-48 (1986).

[38] *Faust*, at *2-3.

statement, hold that the skirmish line was content neutral, and next look to whether the skirmish line was narrowly tailored to serve a significant government interest.[39]

2.      Narrowly Tailored To Serve A Significant Governmental Interest

A regulation is narrowly tailored if "the means chosen are not substantially broader than necessary to achieve the government's interest."[40]   In order to demonstrate that a challenged restriction is narrowly tailored, the government must demonstrate that the restriction "serve[s] a substantial state interest in 'a direct and effective way.'"[41] Absent such proof, a restriction may not be sustained if it provides only ineffective or remote support for the government's purpose.[42]   Thus, a regulation is not narrowly tailored when it does not sufficiently serve those public interests that are urged as its justification.[43]

The appellate court held that the skirmish line was not narrowly tailored to serve the government's interest in public safety because all members of the Kingdom Baptist Church were barred from proceeding down the street merely because of their association with the church.  However, we find that, while a regulation of the time, place, or manner of protected

---

[39] *See, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983) (holding that "[f]or the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end").

[40] *Ward,* 491 U.S. at 800.

[41] *Edenfield v. Fane*, 507 U.S. 761, 773 (1993) (citing to *Ward v. Rock Against Racism*, 491 U.S. at 800).

[42] *Id.* at 770.

[43] *United States v. Grace*, 461 U.S. 171, 181 (1983) (noting that the section that totally banned the specified communicative activity on public sidewalks could not be justified as a "reasonable place restriction" because there was no sufficient nexus between the restriction and any public interest).

speech must be narrowly tailored to serve the government's legitimate, content-neutral interest, it need not be the least restrictive or least intrusive means of doing so.[44] Rather, the narrow tailoring requirement is met "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."[45]

The government has a significant interest in ensuring public safety and order.[46] "It is a traditional exercise of the States' police powers to protect the health and safety of their citizens."[47] Police officers have lawful authority to maintain public safety, particularly when crowds of people are gathered, and there is the perceived possibility of a riot or other threat to public safety.[48] A government must have some ability to protect from harm a speaker, the audience, and public and private property near the place of a potentially hostile speech environment.[49] The Supreme Court has clearly expressed the importance of public safety in

---

[44] *Ward*, 491 U.S. at 798.

[45] *Id.* at 799 (citing to *United States v. Albertini*, 472 U.S. 675, 689 (1985)).

[46] *See, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981) ("As a general matter . . . a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."); *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 376 (1997) (noting that maintaining peace and public safety is a significant government interest).

[47] *Hill v. Colorado*, 530 U.S. 703, 715 (2000).

[48] For example, Texas Penal Code § 42.03 provides that "a person commits an offense if, without legal privilege or authority, he intentionally, knowingly, or recklessly: (2) disobeys a reasonable request or order to move issued by a person the actor knows to be or is informed is a peace officer, a fireman, or a person with authority to control the use of the premises: . . . (B) to maintain public safety by dispersing those gathered in dangerous proximity to a fire, riot, or other hazard."

[49] *See, e.g., Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 375 (D.C. Cir. 1992) (noting that the "government must have some leeway to make adjustments necessary for the protection of participants, innocent onlookers, and others in the vicinity").

noting that, "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order appears, the power of the State to prevent or punish is obvious."[50]

The officers' decision to prevent all members of the Kingdom Baptist Church from crossing the skirmish line was reasonable in light of the information they had received about previous instances of violent confrontations erupting between church members and gay pride parade supporters.[51] Officer DeHoyos was clear that the skirmish line was implemented because the officers were concerned for the safety of both the protestors and the parade supporters and participants.[52] The officers' goal in preventing potentially dangerous confrontations had the highest probability of being achieved by creating a temporary separation of time and space between the two groups. Absent this physical separation, a nonviolent and peaceful end to the parade might not have been achieved. Moreover, the fact

---

[50] *See, e.g.*, *Feiner v. New York*, 340 U.S. 315, 320-21 (1951) (citing to *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)).

[51] The court of appeals seems to have placed little emphasis on the history of violence exhibited by members of the Kingdom Baptist Church as a justification for the police skirmish line. The court of appeals's opinion mentioned such history of altercations only in general terms, and the court ultimately decided that an assault by one member in the past was not enough to justify the skirmish line. However, we find that there was more evidence to support the police perception of a looming threat than just one prior assault by one church member. Sergeant DeHoyos's testimony and police report recounted several instances when the church members were known to have made extremely disparaging remarks that could incite violence and spark a breach of the peace, not only at the prior year's parade, but on many Friday and Saturday nights in downtown Fort Worth.

[52] *See Glasson v. City of Louisville*, 518 F.2d 899, 906-07 (6th Cir. 1975) (noting that police officers have a duty to protect persons exercising the constitutional right of expression).

that a confrontation had not yet occurred is irrelevant.[53]  The police officers were required to assess the situation, and their decision that it presented a potential danger, even though a confrontation had not yet occurred, was a reasonable one.  Thus, we find that the police officers narrowly tailored the restriction to serve a significant governmental interest.[54]  We next look to whether there were ample alternative channels of communication left open to appellants.

3.    Ample Alternative Channels Of Communication Open

This final requirement is "easily met," so long as the guideline "continues to permit expressive activity" and "has no effect on the quantity or content of that expression."[55]  The officers did not attempt to ban any particular manner or type of expression.  They did not

---

[53] *See ACORN v. St. Louis County*, 930 F.2d 591, 596 ( 8th Cir. 1991) ("The government need not wait for accidents to justify safety regulations.").

[54] Citing to *Cox. v. Louisiana*, 379 U.S. 536, 551 (1965), the dissent emphasizes that the possibility of violence between the protesters and the parade-goers was not sufficient to justify the skirmish line—the proper response to potential and actual violence is for the government to ensure an adequate police presence.  Here, the police did in fact maintain a presence throughout the entire parade.  And, although the temporary skirmish line was, at that particular time, more restrictive than mere police presence, it was a regulation on protected speech that was reasonable in time, manner, and place.  The church members were not prohibited from continuing their protests, nor were they prohibited from espousing their views.  The cases relied upon by the dissent involve complete suppression of speech, such as mass arrests of demonstrators who refused orders to completely disperse (*Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996)), and an ordinance making it unlawful to hold public worship meetings on the streets without a permit (*Kunz v. People of New York*, 71 S.Ct. 312 (1951)).  This case does not involve anything close to such a blanket prohibition on protected speech.

[55] *Ward v. Rock Against Racism*, 491 U.S. at 802 ("Indeed, in this respect the guideline is far less restrictive than regulations we have upheld in other cases, for it does not attempt to ban any particular manner or type of expression at a given place or time.").

restrain appellants' movement in any direction except one.[56] The officers told appellants that they were free to proceed anywhere other than southbound at that time. Sergeant Genualdo's testimony indicated that he communicated to Faust that the skirmish line was "for the time being." Therefore, appellants were free to continue their protesting in all directions except for one, and would have been free to proceed down that restricted avenue after a temporary wait. We find that appellants had ample alternative channels of communication open to them.

## CONCLUSION

We therefore hold that the police skirmish line was a lawful exercise of police authority. Although it was a governmental restriction on protected speech, the skirmish line was reasonable because it was justified without reference to the content of the regulated speech, it was narrowly tailored to serve a significant governmental interest, and it left open ample alternative channels for communication of appellants' views. Therefore, we hold that the skirmish line did not violate appellants' First Amendment rights. We agree with the sentiment expressed by the trial court judge—that appellants literally crossed the line, from engaging in purportedly protected speech, to physically interfering with a lawful police order. Therefore, we hold that Section 38.15(a)(1) was not unconstitutionally applied to appellants. We sustain the State's third and fourth grounds for review. In view of our disposition, we

---

[56] Sergeant DeHoyos testified repeatedly that "[t]hey couldn't cross the line—they couldn't cross that line, but you see me on video telling him he can go that way, which was back northbound, or he could have gone eastbound to Commerce Street and gone down Commerce street. He could not—I didn't want him going southbound on Main Street."

need not resolve the State's first two grounds.  We reverse the decision of the court of

appeals and order that the trial court's judgments be reinstated.


DELIVERED:  December 9, 2015
PUBLISH